*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0245a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────────

ABDULLAH SHARIF KAAZIM MAHDI, f/k/a Vernon Smith,

*Petitioner-Appellant,*

*v.*

MARGARET BAGLEY, Warden,

*Respondent-Appellee.*

⟩ No. 05-3471

───────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00978—Paul R. Matia, District Judge.

Argued: March 6, 2007

Decided and Filed: July 7, 2008

Before: BOGGS, Chief Judge; MOORE and GIBBONS, Circuit Judges.

───────────────────

## COUNSEL

**ARGUED:** Robert K. Lowe, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Carol Ann Ellensohn, OFFICE OF THE OHIO ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Robert K. Lowe, Kimberly S. Rigby, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Carol Ann Ellensohn, OFFICE OF THE OHIO ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Columbus, Ohio, Michael L. Collyer, OFFICE OF THE OHIO ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Cleveland, Ohio, for Appellee.

───────────────────

## AMENDED OPINION

───────────────────

JULIA SMITH GIBBONS, Circuit Judge. Petitioner-appellant Abdullah Sharif Kaazim Mahdi (f/k/a Vernon Smith) appeals the district court's denial of his *habeas corpus* petition. Mahdi argues that the district court erred in finding that: (1) his trial counsel was not ineffective; (2) his appellate counsel was not ineffective; and (3) the retroactive application of a change in Ohio case law did not constitute a violation of the Due Process Clause. For the following reasons, we affirm the district court's denial of Mahdi's petition for a writ of *habeas corpus*.

I.

The Supreme Court of Ohio summarized the facts underlying this case as follows:

On the evening of May 26, 1993, defendant-appellant, Vernon Smith, n.k.a. Abdullah Sharif Kaazim Mahdi, and Herbert Bryson robbed the Woodstock Market located at the corner of Woodstock and Avondale in Toledo. During the robbery, Smith fired a single shot at the upper chest of Sohail Darwish, causing his death. Approximately two weeks later, Smith was arrested and then indicted on one count of aggravated murder with a firearm specification, and a death penalty specification alleging that Smith was the principal offender in committing aggravated murder during an aggravated robbery. Smith was also indicted on three counts of aggravated robbery. Subsequently, Smith was found guilty as charged by a jury and sentenced to death.

During the afternoon of May 26, 1993, Smith met up with Herbert Bryson and Lamont Layson at a dirt basketball court in a park at Highland and Maplewood in Toledo. The trio discussed "hitting a lick," i.e., committing a robbery. The group got in Bryson's car, and Smith directed them to the corner of Woodstock and Avondale, where the Woodstock Market was located. Layson remained in the car while Smith and Bryson headed toward the carryout. Jeremiah Bishop, who was two houses down from the Woodstock Market at that time, saw Smith and another person enter the carryout.

Bryson testified that after he and Smith entered the carryout, they noticed only two people in the store, both of whom were behind the counter. Bryson asked about a type of beer, and the storeowner, Sohail Darwish, came around the counter and walked over to the cooler to assist him. Darwish retrieved a forty-ounce beer bottle from the cooler and placed it on the counter. Bryson did the same. As Darwish was ringing up the sale on the cash register, Smith brandished a black gun and ordered Darwish to "open the cash register, motherfucker."

Darwish, who was standing next to Bryson, put his hands up in the air and did not resist. Bryson went behind the counter and hit several buttons on the cash register, trying to open it. Bryson then ordered Darwish to open the cash register, which he did. Darwish then put his hands back up in the air.

Osand Tahboub, a former co-worker who was visiting Darwish at the carryout at that time, testified that the gunman then told Darwish to "move and empty your wallet, motherfucker." As Darwish was reaching for his wallet, Smith fired a single shot, hitting Darwish in the chest. Smith then ordered Tahboub to empty his wallet as well, and the two assailants then fled the scene. Darwish was able to push the alarm button before he fell to the floor. As a result of the single gunshot wound to the upper left side of his chest, Darwish bled to death.

After Smith and Bryson left the carryout, Layson, who was waiting in Bryson's car, noticed Smith holding a gun in his hand when he and Bryson climbed back into the automobile. According to Layson, Smith exclaimed, "Dang, I forgot the beer." When Bryson asked Smith "why did he do it," Smith replied that he shot the man "in the arm" because "he moved too slow," and that "he took too long . . . opening the cash register."

According to Layson, Smith then said, "Fuck him, he in our neighborhood anyway. He shouldn't be in our neighborhood with a store no way." Later, Smith and Bryson

split the money taken in the robbery, which was apparently over $ 400. They also gave Layson all the stolen food stamps from the robbery plus $ 50.

On June 9, approximately two weeks after the murder, police detective Dennis Richardson received information that persons possibly involved in a homicide were incarcerated in the Sandusky County Jail. Based on this and other information he received from sources, Richardson made up an eight-man photo array, including a photo of Herbert Bryson, to show to Tahboub. The next day, upon viewing the array, Tahboub selected Bryson's photo as "not the guy with the gun, but the other guy." Based on this information and the fact that computer records showed Smith as a known associate of Bryson, Richardson compiled a second photo array that included a picture of Smith. Richardson showed Tahboub the second photo array, and Tahboub immediately selected Smith's photo as that of the gunman.

Consequently, Smith was arrested, and along with Bryson and Layson, was indicted by the grand jury in the Darwish murder. In count one, Smith was charged with aggravated felony-murder during an aggravated robbery. A death penalty specification attached to this count alleged that Smith was the principal offender in the aggravated murder during a robbery, R.C. 2929.04(A)(7). The second count charged Bryson and Layson with aggravated felony-murder during an aggravated robbery. Counts three through five charged all three defendants with aggravated robbery of the carryout, of Darwish, and of Tahboub respectively. All five counts also carried firearm specifications.

*State v. Smith*, 731 N.E.2d 645, 648-49 (Ohio 2000), *recons. denied*, 735 N.E.2d 457 (Ohio 2000), *cert. denied*, 531 U.S. 1167 (2001).

At trial, Mahdi was convicted of aggravated felony-murder and of three counts of aggravated robbery. He presented no evidence in the guilt phase. At the subsequent penalty phase, Mahdi's presentation included testimony of a Muslim counselor that Mahdi had converted to Islam while awaiting trial and now counseled other prisoners. The counselor also testified that Mahdi had told him that the shooting had been unintentional, that Mahdi had been nervous and scared, and that the trigger had just gone off. Mahdi's wife testified that Mahdi had been upset and nervous the evening of the shooting and for days afterward. She further testified that, when he heard on the news that Darwish was dead, Mahdi sat down and cried and told her that the murder had been an accident. Moreover, Mahdi's wife testified that, on the afternoon before the crime, she and her husband went to see the film *Menace II Society*, whose opening scene depicted an interracial crime in which a black man had words with a store owner and angrily shot him. A psychologist also testified at the mitigation hearing and noted the striking parallels between the film and the crime, opining that it could not have been coincidence that Mahdi later committed a crime so similar to the one he witnessed in the film. In addition, the psychologist testified to the effects of various social and cultural factors on Mahdi, all of which, he believed, impaired Mahdi's ability to conform his conduct to the law. The pschologist further opined that these factors combined with Mahdi's difficult childhood caused a mental illness, although the psychologist was unable to identify the illness with specificity due to Mahdi's lack of cooperation during the interview process.

At the end of the mitigation hearing, the jury returned with a death sentence; in turn, the trial court sentenced Mahdi to death and to a consecutive term of eighteen to fifty-three years in prison. On direct appeal, the state court of appeals affirmed the convictions and sentences. The Ohio Supreme Court affirmed the court's decision. *State v. Smith*, 731 N.E.2d at 660. Mahdi subsequently exhausted his state post-conviction remedies.

In 2002, Mahdi filed a federal *habeas corpus* petition, raising the following ten claims as grounds for relief: (1) trial counsel were ineffective in failing to *voir dire* prospective jurors on racial bias; (2) the trial court erred in failing to instruct the jury on the lesser included offense of involuntary manslaughter; (3) the penalty-phase jury instructions were incorrect; (4) the state court of appeals denied Mahdi his constitutional rights by refusing to consider residual doubt; (5) trial counsel were ineffective in not objecting to flawed penalty-phase jury instructions and in not requesting a competency hearing; (6) counsel rendered ineffective assistance in the state court of appeals; (7) trial counsel were ineffective in the penalty phase in not presenting certain mitigating evidence; (8) the trial court erred in failing to hold a competency hearing *sua sponte*; (9) the cumulative effect of the errors and omissions presented in the habeas petition deprived Mahdi of his constitutional rights; and (10) the Ohio Supreme Court conducted an inadequate proportionality review. Mahdi abandoned the tenth claim in his reply brief. The district court denied the rest of the petition and dismissed the case, but granted a Certificate of Appealability ("COA") on Claim 1, as well as Claim 6 to the extent it raised the failure to *voir dire* prospective jurors on racial and religious bias. This court expanded the COA to include Claim 4. Thus, before this court on appeal are three claims: (1) whether trial counsel were ineffective in failing to *voir dire* prospective jurors on racial and religious bias;[1] (2) whether appellate counsel rendered ineffective assistance in the state court of appeals; and (3) whether the state court of appeals denied Mahdi his constitutional rights pursuant to the Due Process Clause by refusing to consider residual doubt.

## II.

The government argues that Mahdi's first claim – that his trial counsel were ineffective – has been procedurally defaulted. We, however, need not address whether in fact Mahdi has procedurally defaulted this first claim. As noted by the district court in its grant of a COA, Mahdi's contentions that both his trial counsel and appellate counsel were ineffective are analytically linked. Mahdi claims that his appellate counsel was ineffective for not appealing the ineffectiveness of his trial counsel. Thus, each claim relies on the underlying argument that Mahdi's trial counsel were ineffective. Because we must reach the merits of whether trial counsel were ineffective in order to dispose of Mahdi's claim that his appellate counsel were ineffective, we decline to address whether Mahdi's claim of ineffectiveness of trial counsel is procedurally defaulted. Indeed, this court has held that "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," especially where the procedural default issue is "complicated" and "is unnecessary to [the] disposition of the case." *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.")).

For related reasons, the three issues presented to this court can be consolidated to two issues. As discussed below, we conclude that Mahdi's trial counsel were not ineffective. Such a determination is dispositive of the first two issues Mahdi argues on appeal; if Mahdi's trial counsel were not ineffective, then his appellate counsel cannot have been ineffective for failing to raise the claim that trial counsel were ineffective. We therefore address only two issues, which enable us to dispose of the three claims presented by Mahdi to this court: (1) whether Mahdi's trial counsel were ineffective for failing to *voir dire* prospective jurors on racial and religious bias, and (2) whether the state court of appeals deprived Mahdi of his constitutional rights under the Due Process Clause by

---

[1] Although the district court granted a certificate of appealibility on Mahdi's "first and sixth claims for relief as they relate to his right to voir dire the venire on racial grounds," Mahdi clearly incorporated a claim regarding trial counsel's failure to *voir dire* on religious grounds into this first (failure to *voir dire* on racial grounds) claim when presented in his reply brief. Thus, we interpret the district court's certificate of appealibility to encompass Mahdi's claims that are predicated on the failure to *voir dire* on both racial and religious grounds.

retroactively applying a new state law that determined residual doubt was no longer to be considered to be a mitigating factor. We consider each issue in turn.

1.

Mahdi argues that counsel rendered ineffective assistance on his first appeal of right by not raising as error trial counsel's ineffective assistance in failing to *voir dire* prospective jurors on racial and religious bias. In turn, Mahdi also claims that his appellate counsel were ineffective for failing to appeal his conviction on these grounds. The Warden responds, among other arguments, that these claims are meritless because Mahdi has failed to establish that trial counsel's failure to *voir dire* prospective jurors on racial and religious bias constitutes objectively deficient performance. And, if the ineffectiveness claims against trial counsel lack merit, no prejudice could have resulted from the appellate counsel's failing to appeal Mahdi's conviction and sentence on these grounds.

Claims of ineffective assistance of counsel are judged under the *Strickland* standard, which requires that the appellant affirmatively establish "(1) that counsel's performance was objectively deficient; and (2) prejudice, which means that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Haliym v. Mitchell*, 492 F.3d 680, 694 (6th Cir. 2007) (citing and quoting *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). In addition, defendants are constitutionally entitled to effective assistance of counsel for appeals of right. *Bowen v. Foltz*, 763 F.2d 191, 194 n.3 (6th Cir. 1985) (citing *Gilbert v. Sowders*, 646 F.2d 1146 (6th Cir. 1981)).

The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state court. *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976); *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors") (internal quotation marks omitted). Mahdi argues that by not conducting a *voir dire* that addressed religious and racial bias his counsel failed to ensure that an impartial jury would hear Mahdi's case.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> a federal court may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . or (2) the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (quoting 28 U.S.C. § 2254(d)) (quotation marks omitted). "A state-court decision is considered 'contrary to . . . clearly established federal law' if it is 'diametrically different, opposite in character or nature, or mutually opposed.'" *Ivory v. Jackson*, __ F.3d __, 2007 U.S. App. LEXIS 26458, at *12 (6th Cir. Nov. 15, 2007) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (quotation marks omitted)). In order to constitute an "'unreasonable application of . . . clearly established Federal law,' a state-court decision on the merits must be 'objectively unreasonable,' not simply erroneous or incorrect." *Id.* (citing *Williams*, 529 U.S. at 409-11). Furthermore, "[t]he state court's findings of fact are presumed to be correct unless they are rebutted by 'clear and convincing evidence.'" *Id.* (citing *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007)).

The Ohio Supreme Court addressed Mahdi's claim of ineffective assistance of counsel on the merits as follows:

Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, (1984). *Accord State v. Bradley*, 42 Ohio St. 3d 136 (1989).

Smith [n.k.a. Mahdi] asserts many conclusions, one of which is that the trial was racially charged, since the murder was committed by a black man and the victim was "a man of Arabic descent who operated a grocery store in the inner city." Characteristic of Smith's arguments under this proposition is his conclusion that "because the conflict between blacks and the immigrant newcomers envelops the overall debate on black/white relations, racism may have been a factor in the jury's decision to convict [Smith] of aggravated murder." (Footnote omitted.) Other examples of Smith's argument that the entire trial was fraught with racially charged evidence include trial counsel's strategy during the mitigation phase to highlight the black "gangsta" movie "Menace II Society," relying on the testimony of an Islamic jail counselor, citing the movie "Malcolm X," and relating defendant's story of life in the inner city.

Smith relies on *Turner v. Murray*, 476 U.S. 28, 36-37 (1986), for the proposition that a capital defendant accused of an interracial crime is entitled to have the venire questioned so as to reveal any possible racial bias. Smith contends that, in the racially charged atmosphere of this case, competent counsel would have taken advantage of that entitlement.

In our view, Smith's arguments are purely speculative and unconvincing. We have held that "the conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St. 3d 231, 247 (1992). Moreover, as we noted in *State v. Watson*, 61 Ohio St. 3d 1 (1991), under *Turner v. Murray*, the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel. *Id.*, 476 U.S. at 37, and fn. 10.

*State v. Smith*, 731 N.E.2d at, 651-52. Nothing in the Supreme Court of Ohio's analysis could be construed as contrary to clearly established federal law. In fact, the court reasonably interpreted Supreme Court precedent, noting that decisions about the content of questions during *voir dire* are typically left to the discretion of the trial counsel. *See, e.g.*, *Lear v. Cowan*, 220 F.3d 825, 829 (7th Cir. 2000) (holding that trial counsel's failure to *voir dire* jurors on racial bias was not "unprofessional, subpar representation per se," and noting that "there are tactical reasons why a lawyer would not want to direct the jurors' attention to the interracial character of the crime, and the [*Turner*] Court recognized this"); *accord Hasan v. Ishee*, 2006 U.S. Dist. LEXIS 83926, at *28-32 (S.D. Ohio Aug. 14, 2006). Indeed, as the Supreme Court of Ohio explained,

Counsel could have properly determined that the examination of jurors' racial views during voir dire would be unwise, since the subject of racial prejudice is sensitive to most people, and raising it during voir dire could cause some jurors to be less candid if confronted with direct questions attempting to discern any hint of racial prejudice. In addition, our reading of the record leads us to conclude, contrary to Smith's assertions, that racial issues were not "woven into the fabric of trial."

*State v. Smith*, 731 N.E.2d at 652. This observation is especially appropriate in this case, since Mahdi's counsel apparently hoped that the jury would conclude that the murder of Darwish had been an accident. Conducting a *voir dire* on racial and religious grounds could have emphasized the possible role of racial and religious animus in the commission of the crime, bolstering the

prosecution's claim that the murder had been intentional. Thus, counsel had to weigh the potential harm that could flow from a *voir dire* on racial and religious bias against its arguable benefit. Trial counsel's decision not to *voir dire* prospective jurors on racial and religious bias seems a reasonable tactical decision.

Moreover, as the Supreme Court of Ohio concluded,

Yet, even if we viewed counsel's trial strategy as questionable, such a strategy should not compel us to find ineffective assistance of counsel. In these situations, we normally defer to counsel's judgment. *State v. Clayton*, 62 Ohio St. 2d 45, 49 (1980). Since we find no legitimate basis for Smith's assertions that counsel were ineffective for not examining the venire on racial or religious bias, this proposition is not well taken.

*State v. Smith*,731 N.E.2d at 652. Such an application cannot be said to constitute an objectively unreasonable application of federal law. Instead, it is based upon a particular view of the factual record in this case, determinations that under AEDPA are presumed to be correct, to which the court applied its reasonable interpretation of federal law. Consequently, Mahdi's claim that his trial counsel were ineffective fails. In turn, because Mahdi has failed to demonstrate that his trial counsel were ineffective, the claim that his appellate counsel were ineffective also fails. Given that Mahdi's trial counsel were not ineffective, Mahdi cannot argue that he suffered prejudice from his appellate counsel's failure to raise trial counsel's decision not to question jurors about religious and racial bias. No prejudice flows from the failure to raise a meritless claim.

2.

Mahdi next argues that he was denied due process on his first appeal of right when the state court of appeals, in its independent review of his death sentence, applied a change in case law that retroactively forbade consideration of one of the mitigators he had relied on at trial: residual doubt. Indeed, when Mahdi was tried, Ohio law recognized residual doubt as a mitigating factor. *See State v. Watson*, 572 N.E.2d 97, 111 (Ohio 1991). Accordingly, Mahdi now argues that he devoted, what he describes as, "a significant portion" of his efforts at the penalty phase to presenting residual-doubt evidence, arguing that there existed some doubt as to his intent to kill. In fact, Mahdi persuaded the trial court to instruct the jury on employing residual doubt as a mitigating factor. While his case was before the state court of appeals on direct appeal, however, the Supreme Court of Ohio declared that residual doubt was not an acceptable mitigator under the state death-penalty statute, thus abrogating *Watson*. *See State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997). As a result, the state court of appeals held that it could not consider residual doubt when independently determining whether the aggravating factors outweighed the mitigating factors in Mahdi's case. The Ohio Supreme Court subsequently held that it was not error to apply *McGuire* retroactively, *State v. Smith*, 731 N.E.2d at 657 (citing *State v. Bey*, 709 N.E.2d 484, 503 (Ohio 1999)), but also went on to conclude that residual doubt would be entitled to very little weight in mitigation. *Id*. at 660.

Mahdi emphasizes that he does not challenge the constitutionality of *McGuire*; instead, Mahdi only challenges the retroactive application of *McGuire* to his case. He argues that due process was violated because it was fundamentally unfair for the court of appeals to apply *McGuire* retroactively given that Mahdi's strategy at the mitigation hearing relied on the then-good law of *Watson*. He further argues that, because Ohio law granted him two appeals of right, the intermediate appellate court's failure to consider residual doubt denied him due process by depriving him of his right to a meaningful dual review of his death sentence.

We need not determine whether the Supreme Court of Ohio unreasonably applied clearly established federal law in applying *McGuire* retroactively. Despite its approval of the retroactive

application of *McGuire*, the Ohio Supreme Court in fact weighed residual doubt and noted that it was entitled to little weight. The court noted that the testimony of defense mitigation witnesses that Mahdi claimed the shooting was accidental was unpersuasive and that the eyewitness testimony negated the absence of intent to kill. Mahdi was not in fact deprived of an appellate weighing of residual doubt.[2]

## III.

Because the claims presented were adjudicated on the merits by the Supreme Court of Ohio, and such adjudication did not contradict clearly established federal law, we affirm the district court's denial of Mahdi's petition for a writ of *habeas corpus*.

---

[2]Mahdi further points out that O.R.C. § 2929.05 grants a capital defendant the right to a dual review of his sentence. Mahdi argues that his due process rights were violated, despite the fact that the Ohio Supreme Court considered residual doubt, because the Ohio Court of Appeals did not consider residual doubt. Therefore, Mahdi claims, he did not get two meaningful reviews of his sentence as required by Ohio law and this violation of state law amounts to a deprivation of his due process rights under the federal constitution.

It is true that "if a State has created appellate courts as an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant the procedures used in deciding appeals must comport with the demands of the Due Process . . . Clause[] of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (internal quotation marks and citation omitted). However, in *Evitts* the Court was concerned that the quality of review afforded by Kentucky law would not be meaningful if the defendant was not entitled to effective assistance of counsel. Under such circumstances, a state-created appellate process could run afoul of the Due Process Clause. *See also Griffin v. Illinois*, 351 U.S. 12 (1956) (holding that the failure to provide defendants with transcripts necessary to pursue an appeal free of cost implicated due process and equal protection concerns). Neither *Evitts* nor *Griffin* instructs us, however, to find that Mahdi did not receive the meaningful appellate review required under the Due Process Clause. Here, the sentencing jury considered residual doubt. So did the Supreme Court of Ohio. Thus, in contrast to the concerns implicated in *Evitts* and *Griffin*, the Ohio Court of Appeals's failure to consider residual doubt as a mitigating factor did not preclude Mahdi's from receiving meaningful appellate review of his sentence. Indeed, such a conclusion comports with the due process analysis propounded by other circuits. *See Rust v. Hopkins*, 984 F.2d 1486, 1493 (8th Cir. 1993) (noting that an appellate court is "fully competent to 'cure' some sentencing deficiencies in capital cases . . . such as the improper consideration of an invalid aggravating circumstance").