NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0002n.06

Case No. 22-2084

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ANDREW WOODBURN, | ) | **FILED** |
| Petitioner-Appellant, | ) | Jan 04, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE |
| BRYAN MORRISON, Warden, | ) | UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Respondent-Appellee. | ) |  |
|  | ) | O P I N I O N |

Before: MOORE, McKEAGUE, and KETHLEDGE, Circuit Judges.

**McKEAGUE, Circuit Judge.** A Michigan jury convicted Andrew Woodburn of assault with intent to commit murder after he crashed his pickup truck into an occupied police car. Woodburn now seeks habeas relief under 28 U.S.C. § 2254 for ineffective assistance of trial and appellate counsel. Woodburn argues that his trial lawyer was ineffective for failing to investigate and raise an involuntary intoxication defense based on unusual interactions between Woodburn's prescribed antidepressant and alcohol. He similarly argues that his appellate lawyer was ineffective for failing to raise that issue on direct appeal. But a Michigan state court already considered Woodburn's claims and rejected them on the merits. Because that state-court decision was not unreasonable, the district court properly denied habeas relief. The district court also properly denied Woodburn's request for an evidentiary hearing because the state court adjudicated both claims on the merits after considering the necessary facts. We **AFFIRM**.

## I.

In June 2013, police officers arrested Andrew Woodburn after he drank a bottle of rum and drove his pickup truck into a state trooper's patrol car. Michigan authorities charged Woodburn with, among other things, assault with intent to commit murder. State prosecutors alleged that Woodburn possessed the specific intent to kill the state trooper. *See* Mich. Comp. Laws § 750.83.

### A.    Trial in State Court

Woodburn faced trial in a Michigan state court. Shortly before trial began, Woodburn's lawyer informed the court that he intended to rely on Woodburn's prescription medications and alcohol consumption to argue that Woodburn could not form the requisite intent to kill. But, applying Michigan law, the state court ruled that voluntary intoxication was not a valid defense to specific-intent crimes. The court therefore barred any evidence of Woodburn's medications or alcohol intoxication if submitted for the purpose of negating intent. Rather, such evidence was admissible only to help demonstrate that the automobile collision was an accident.

The evidence at trial painted the following picture:

Woodburn lived in northern Michigan with his parents. About three weeks before the June 2013 automobile collision, he began taking a prescribed antidepressant called Paxil. At the time, he was also taking a few other prescribed medications.

On June 23—the day of the collision—Woodburn took his Paxil around noon. He felt sore and "had this inclination to get alcohol" because he thought it would make him feel better. Trial Tr., R.6-6 at PageID 580–81. Woodburn bought a bottle of spiced rum from a nearby grocery store and drank the entire bottle within a couple hours. When the alcohol's effects kicked in, an intoxicated Woodburn started arguing with his parents about his abrupt plan to move to Florida.

The argument escalated. Woodburn, agitated and increasingly becoming upset, asked his parents about guns. He wanted some guns because he intended to make money in Florida by shooting feral hogs. But Woodburn's mother, Sharon, had removed all guns from the home two

days earlier and given them to a neighbor for safekeeping. Sharon lied to Woodburn and told him that the guns were in a storage locker in Gaylord, Michigan. She retreated to her bedroom, and Woodburn pounded on the door.

Alarmed by her son's demeanor, Sharon called 911. She told the dispatcher that Woodburn was violent and not in his right mind. On the recorded 911 call, Woodburn could be heard in the background threatening to kill his mother if she called the police. The recording also captured Woodburn saying that the first officer to respond was "dead" (or perhaps "done"). Sharon explained to the dispatcher that her son was "going through like a psychotic episode" and would "kill anybody that's in his way." Trial Tr., R.6-4 at PageID 259–60. Woodburn probably had a machete and some knives, she added. She also warned that her son would likely try to provoke responding officers into shooting him. By then, Woodburn had left the house and gotten into his Ford pickup truck. Sharon described the vehicle to the dispatcher.

A state trooper responded to the 911 call in a marked patrol car. The Woodburns lived on a one-lane private trail that feeds into a public road. The trooper initially positioned his vehicle on the public road's shoulder, close to the intersection with the private trail. He saw Woodburn's truck driving on the trail toward the public road. Hoping to stop Woodburn, the trooper activated his overhead lights and pulled his vehicle one or two car-lengths onto the graveled trail, partially blocking Woodburn's access to the larger road. The trooper saw Woodburn throw something out the driver's side window and begin to accelerate. At that point, Woodburn's truck was about 300 to 400 yards away and closing in at approximately 60 miles per hour. Without slowing down or attempting to maneuver around the patrol car, Woodburn drove his truck head-on into the trooper's vehicle. The collision forced the police car into the public road, where it was struck by another passing car. Woodburn's truck ended up in a nearby ditch.

The trooper exited his mangled vehicle, approached the pickup truck, and ordered Woodburn to get out. Woodburn did not initially comply, but he eventually rolled out of the truck

and yelled "just shoot me" two or three times. Trial Tr., R.6-6 at PageID 592–93. The trooper tased Woodburn. Another police officer arrived at the scene, handcuffed Woodburn, and took him into custody.

Woodburn testified that he did not intend to kill the trooper. He explained that he simply wanted to drive down to Gaylord to pick up some guns, and then continue driving to Florida. He recalled smashing into some posts and hitting a culvert as he drove down the private gravel trail. According to Woodburn, he spotted the trooper's patrol car and thought he might get pulled over for driving under the influence. Woodburn started tossing empty liquor bottles out the driver's side window. He testified that he knew "the accelerator was being mashed on at points" and that he was probably "pushing on it" while reaching down and grabbing empty bottles. *Id.* at PageID 589. He added that the thought of hitting the brakes never crossed his mind. But Woodburn attested that he "didn't mean to" hit the police car. *Id.* at PageID 594. Rather, he thought that he "might just be able to pass this officer" and turn onto the public road. *Id.* at PageID 598, 611, 615.

The jury was unpersuaded. It convicted Woodburn of assaulting the trooper with the intent to murder him. It also convicted Woodburn of being a felon in possession of a firearm. The state trial court sentenced him for both crimes.

### B.     Direct Appeal in State Court

Represented by new counsel, Woodburn appealed his conviction and sentence in Michigan's court of appeals. Woodburn argued that he received ineffective assistance of trial counsel because his trial lawyer (1) failed to consult an accident-reconstruction expert, (2) introduced the nature of Woodburn's prior conviction, (3) failed to sever Woodburn's felon-in-possession charge from his assault-with-intent-to-murder charge, and (4) allowed prosecutors to introduce as evidence a knife collection that police recovered from Woodburn's pickup truck. Woodburn also argued that the trial court improperly calculated his sentence.

The court of appeals remanded the case back to the trial court for an evidentiary hearing on Woodburn's ineffective-assistance-of-counsel claims. After conducting that evidentiary hearing, the state trial court denied Woodburn's request for a new trial and re-imposed his original sentence. The court of appeals affirmed, and Michigan's supreme court declined to hear the case.

## C.      State Post-Conviction Proceedings

Woodburn, represented by his current lawyer, filed a motion for relief from judgment in the state trial court. The motion raised—for the first time—his prior lawyers' failure to pursue a temporary insanity defense based on the involuntarily intoxicating effect of his prescribed Paxil. Woodburn argued that his trial lawyer was ineffective for failing to consult a psychopharmacology expert and present the involuntary intoxication defense. Relatedly, he argued that his appellate lawyer was ineffective for neglecting to raise those trial-counsel deficiencies on direct appeal and during Woodburn's subsequent evidentiary hearing.

Woodburn's motion relied on a report by Dr. David Healy, a psychopharmacology expert based in the United Kingdom. Dr. Healy has long studied the effects of Paxil and related antidepressants. According to his research, those medications have an obscure but well-documented tendency to induce alcohol cravings. His report concluded that Woodburn's "behavior was significantly affected by his Paxil intake, which led to an interaction with alcohol and a resulting mental state that left him essentially delirious with diminished responsibility for his actions on the day of the offense." State Docs., R.6-12 at PageID 1362 (expert report). Among other things, Dr. Healy opined that Paxil had "most unusually" caused Woodburn to become involuntarily intoxicated by inducing him to compulsively consume alcohol. *Id.* at PageID 1359.

Woodburn also referenced a pair of alcohol-related incidents in the days preceding the automobile collision. Three days before the collision, Woodburn nearly drowned in a river after reportedly drinking a fifth of rum. The following day, Woodburn jumped out of a moving car and was found hours later lying in a field; an emergency-room physician diagnosed Woodburn with

acute alcohol intoxication. Dr. Healy's report cited those episodes and reasoned that they supported his theory that Woodburn was involuntarily intoxicated by Paxil. After all, Woodburn's sudden binge drinking started mere weeks after starting his Paxil treatment. He had previously been sober for several years following his struggle with substance abuse.

After reviewing the motion and Dr. Healy's report, the state trial court denied Woodburn's request for post-judgment relief. It rejected his ineffective-assistance claims on three separate grounds: First, Woodburn failed to overcome the presumption that his trial lawyer was implementing sound trial strategy by avoiding a defense theory that was arguably inconsistent with Woodburn's own testimony that the crash was an accident. Second, Woodburn never established that his lawyers' failure to investigate and consult an expert regarding Paxil's side effects was unreasonable under prevailing professional norms. Finally, Woodburn likely lacked a viable involuntary intoxication defense under Michigan law. The state's court of appeals and supreme court both declined to review the trial court's decision.

### D. Federal Habeas Proceedings

Woodburn petitioned for a writ of habeas corpus in federal district court. He raised the same two claims that he had brought in his state-court motion for relief from judgment: his trial lawyer was ineffective for failing to investigate and present an involuntary intoxication defense, and his appellate lawyer was ineffective for failing to raise trial counsel's failure on appeal. Woodburn also sought an evidentiary hearing to flesh out his claims.

The district court denied the petition, reasoning that the state court did not unreasonably reject Woodburn's claims. It also denied Woodburn's request for an evidentiary hearing, concluding that its review was limited to the record before the state court that rejected Woodburn's claims on the merits. However, the district judge certified the ineffective-assistance-of-trial-counsel claim for appeal. This Court, in a single-judge order, expanded our scope of review to include the appellate-counsel claim. Woodburn now appeals.

## II.

Woodburn argues that the district court erred in rejecting his habeas claims for ineffective assistance of trial and appellate counsel. He also contends that the district court erroneously denied his request for an evidentiary hearing.

### A.       Habeas Claims for Ineffective Assistance of Counsel

We turn first to Woodburn's two ineffective-assistance habeas claims. This Court reviews a district court's denial of habeas relief de novo. *Daniel v. Burton*, 919 F.3d 976, 978 (6th Cir. 2019). The district court's factual findings are reviewed for clear error, and its legal conclusions on mixed questions of law and fact are reviewed de novo. *Id.*

The state court's underlying decision, however, deserves more deference. A Michigan court already rejected Woodburn's ineffective-assistance claims on the merits. To prevail in this federal habeas action, Woodburn must therefore overcome the heightened standard of review imposed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Relevant here, he must demonstrate that the state court's decision to deny his claims involved an "unreasonable application" of clearly established federal law, as determined by U.S. Supreme Court precedent. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (clarifying that AEDPA imposes a "new constraint" on federal habeas relief where state prisoners' claims have been adjudicated in state court).

Under AEDPA, we cannot disturb the state court's ruling unless its application of clearly established federal law was "objectively" unreasonable. *Williams*, 529 U.S. at 409. That requires more than a showing that the state court was "incorrect." Even an incorrect state-court application of federal law survives our habeas review unless it was also objectively unreasonable. *Id.* at 410–11. Federal habeas relief is improper whenever "fairminded jurists could disagree" about the correctness of the state-court decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

And the substantive ineffective-assistance standard poses its own high bar: Woodburn must satisfy *Strickland v. Washington*'s two-pronged test to prevail. 466 U.S. 668 (1984). *First*, he must prove that counsel's performance was deficient. That entails a showing that counsel "made errors so serious" that the lawyer was not functioning as the "counsel" guaranteed by the Constitution. *Id.* at 687. Courts approach this highly deferential inquiry with a "strong presumption" that counsel was furthering a sound strategy. *Id.* at 689. We afford counsel every benefit of the doubt and affirmatively consider the range of possible reasons behind counsel's decisions. *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). *Second,* Woodburn must also show that counsel's deficient performance prejudiced him. Prejudice requires a "reasonable probability" that, but for counsel's deficient performance, Woodburn's case would have ended with a different result. *Strickland*, 466 U.S. at 694. That probability must be "sufficient to undermine confidence" in the proceeding's outcome, but it need not rise to the level of "more likely than not." *Id.* at 693–94.

*Strickland*'s difficult-to-meet standard is magnified when viewed through the deferential AEDPA lens. *See* 28 U.S.C. § 2254(d)(1); *see also Harrington*, 562 U.S. at 105 (noting that our review is "doubly" deferential when both *Strickland* and § 2254(d) apply). To grant habeas relief, a federal court must conclude that the state court's application of *Strickland* was "unreasonable"— not just that it was wrong. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). And because *Strickland*'s general standard relies heavily on case-specific considerations, state courts enjoy particularly wide latitude to reasonably deny ineffective-assistance claims. *Id.*

### 1. Trial Counsel

Woodburn first targets his trial attorney's performance. He argues that his trial lawyer provided ineffective assistance by failing to consult a psychopharmacology expert and present an involuntary intoxication defense. Woodburn contends that such a defense—based on his Paxil ingestion and the resulting interaction with compulsorily consumed alcohol—was his only viable trial strategy.

That argument failed in state court. Among other things, the state judge determined—and the district court agreed—that Woodburn likely lacked a viable involuntary intoxication defense under Michigan law. Therefore, the courts reasoned, Woodburn failed to satisfy either of *Strickland*'s two prongs: counsel's performance was not deficient for failing to raise an inapplicable defense, and Woodburn was not prejudiced because the defense would likely have failed anyway.

As a federal habeas court, we cannot question a state court's application of state law. *E.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Federal habeas relief is not available for state-law errors. *Lewis*, 497 U.S. at 780; *see also* 28 U.S.C. § 2254(a) (limiting habeas relief to violations of federal law). We therefore cannot grant habeas relief for ineffective assistance of counsel when doing so requires a determination that the state court erred in interpreting its own law. *Davis v. Straub*, 430 F.3d 281, 290–91 (6th Cir. 2005). That arguably ends our inquiry in this case altogether. After all, the state court grounded its ineffective-assistance decision in its interpretation and application of Michigan's involuntary intoxication defense. To the extent that we *can* question the state court's decision—perhaps as an "unreasonable determination of the facts in light of the evidence presented" under 28 U.S.C. § 2254(d)(2)—we nevertheless conclude that the state court acted reasonably in denying Woodburn's claim.[1]

The state court explained that Michigan recognizes a temporary insanity defense for defendants who commit crimes while involuntarily intoxicated by prescribed medications. But, it continued, Michigan law limits that defense to situations where the defendant lacked reason to know that the prescribed drug was likely to have its intoxicating effect. In addition, the prescribed drug—not another substance—must have caused the intoxicating condition. *See People v. Caulley*, 494 N.W.2d 853, 859 (Mich. Ct. App. 1992). Examining the record, the state court concluded that Woodburn fell short of satisfying both requirements.

---

[1] Because this conclusion forecloses Woodburn's claim, we need not consider the state court's alternative grounds for denying relief.

First, the court decided that Woodburn had reason to know about Paxil's intoxicating effect. This reasonable finding has plenty of support in the record. Dr. Healy's report explains that when Woodburn first tried Paxil in 2004, he became disinhibited and started compulsively consuming alcohol. Woodburn suspected at the time that there was a link between Paxil and his alcohol abuse, and he successfully requested a switch to new medications. Woodburn remained firmly convinced over the years about the connection between Paxil and alcohol abuse. Then, in 2013, Woodburn's new doctor recommended returning to Paxil—in an even higher dose than before. Woodburn started taking Paxil again despite his ongoing concerns about its effects. A psychological report submitted for Woodburn's state-court resentencing proceeding further confirms that Woodburn knew about Paxil's effect on his alcohol consumption and mental state.

Second, the state court decided that alcohol, not Paxil, caused Woodburn's intoxication. No party, after all, disputes that Woodburn drank a substantial amount of rum shortly before the incident. Nor does anyone dispute that Woodburn knew about rum's intoxicating properties. In its order, the court acknowledged that Dr. Healy's report suggested some primary intoxicating effect of Paxil itself. However, it found the thrust of the expert's position to be that Paxil's secondary intoxicating effect—i.e., inducing the involuntary consumption of alcohol—was the main culprit.[2] But, interpreting Michigan law, the state court rejected Woodburn's legal theory. "The fact that Paxil may have heightened Mr. Woodburn's craving for alcohol," it concluded, "does not amount to intoxication." State Docs., R.6-12 at PageID 1478 (order denying motion).

---

[2] To be sure, Woodburn argues that Paxil's primary intoxicating effect must be considered as well. He notes Dr. Healy's observation that Paxil can cause compulsive behaviors and disinhibition, compromise decisionmaking, and trigger aggressive suicidality. But although Dr. Healy opines that Paxil caused Woodburn to become "confused or disorganized" and crave alcohol, he concluded that Woodburn's case likely did not involve "Paxil induced aggression or suicidality." State Docs., R.6-12 at PageID 1358, 1362 (expert report). In light of that record, we do not think the state court was unreasonable when it focused on Paxil's tendency to cause alcohol cravings. Moreover, its factual finding that alcohol caused the traffic collision is entitled to a presumption of correctness—a presumption that Woodburn has not overcome. *See* 28 U.S.C. § 2254(e)(2).

This decision, too, is reasonable. Woodburn cites no Michigan (or other) authorities validating his involuntary intoxication theory. If anything, Michigan caselaw seems to go the other way. *See People v. Osborn*, No. 316228, 2014 WL 5364052, at *3 (Mich. Ct. App. Oct. 21, 2014) (rejecting involuntary intoxication defense where defendant consumed prescription drug and alcohol because defendant could not show that the drug—not alcohol—caused the intoxication). And although at least one Michigan case seemingly endorses an involuntary intoxication defense for the "unexpected effects of combining alcohol with a prescription medication," *see People v. Wilkins*, 459 N.W.2d 57, 58, 60 (Mich. Ct. App. 1990), that lends no clear support to a situation where one intoxicant is alleged to have caused the consumption of another. True, Woodburn also appears to argue that simultaneous interactions between Paxil and alcohol created a more pronounced intoxicated state than one would expect from alcohol alone. But that argument cannot escape the state court's reasonable finding that drinking a bottle of rum immediately before the incident caused Woodburn's intoxication.

Given the state court's conclusion that Woodburn likely lacked a viable involuntary intoxication defense under state law, it reasonably determined that Woodburn cannot satisfy *Strickland*. At best, Woodburn's involuntary intoxication defense constituted a novel and untested theory. His trial lawyer was well within his considerable discretion to proceed instead on a theory that the automobile crash was an accident. *See Alexander v. Smith*, 311 F. App'x 875, 887 (6th Cir. 2009) (holding that counsel's failure to "present a novel legal argument when the caselaw is ambiguous" is not ineffective assistance); *see also Harrington*, 562 U.S. at 110 (stressing that counsel cannot be faulted for making a "reasonable miscalculation" or failing to prepare for seemingly remote possibilities). And given the low likelihood of the defense's success, Woodburn fell short of establishing a reasonable probability of a different trial result.

### 2.     Appellate Counsel

Woodburn next argues that his appellate lawyer was also ineffective—both on appeal and during the state-court evidentiary hearing on remand—for failing to raise the above-described deficiencies in trial counsel's performance. But because Woodburn's underlying trial-counsel claim itself lacks merit, we reject his appellate-counsel claim as well.

The Constitution guarantees criminal defendants the effective assistance of counsel in their first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985). Michigan affords its criminal defendants the right to appeal an adverse judgment following trial, *see* Mich. Comp. Laws § 770.3(a), so Woodburn is entitled to relief if he can satisfy *Strickland*'s two-pronged standard. As with his ineffective-assistance-of-trial-counsel claim, Woodburn must show that his appellate lawyer's representation "fell below an objective standard of reasonableness" and that the lawyer's deficient performance prejudiced him. *Roe v. Flores-Ortega*, 528 U.S. 470, 476–77 (2000) (quoting *Strickland*, 466 U.S. at 688). Moreover, AEDPA's extra layer of deference still constrains our review. *See* 28 U.S.C. § 2254(d)(1). We cannot grant habeas relief unless the state court was "objectively unreasonable" when it rejected Woodburn's appellate-counsel claim on the merits. *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008) (citation omitted).

Under that framework, the state court reasonably applied *Strickland* to reject Woodburn's appellate-counsel claim. After all, Woodburn's appellate lawyer cannot be deemed ineffective for neglecting to raise a meritless issue. *See Wilson v. Mitchell*, 498 F.3d 491, 514–15 (6th Cir. 2007). As we concluded above, the state court reasonably rejected Woodburn's underlying trial-counsel claim—the sole basis for his derivative appellate-counsel claim. That alone forecloses both *Strickland* prongs: appellate counsel was not required to pursue the non-meritorious trial-counsel claim, *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011), and Woodburn can hardly demonstrate a reasonable probability of reversal, *see id.* at 322.

## B.      Evidentiary Hearing

Finally, Woodburn seeks an evidentiary hearing to expand the record. At such a hearing, he intends to present testimony from Dr. Healy and other witnesses to bolster his Paxil-based ineffective-assistance-of-counsel claims.

We review the district court's denial of Woodburn's requested evidentiary hearing for an abuse of discretion. *Black v. Carpenter*, 866 F.3d 734, 742 (6th Cir. 2017). Though AEDPA often constrains district courts' authority to *grant* evidentiary hearings, *see, e.g.*, *Shinn v. Ramirez*, 596 U.S. 366, 381–82 (2022), district courts enjoy more leeway in *denying* such hearings. Whenever a federal court "is able to resolve a habeas claim on the record before it, it may do so without holding an evidentiary hearing." *Black*, 866 F.3d at 742. And where AEDPA precludes federal courts from considering new evidence at all, the district court must deny an evidentiary hearing. Such a hearing would "needlessly prolong" federal habeas proceedings. *Shoop v. Twyford*, 596 U.S. 811, 820 (2022) (quoting *Shinn*, 596 U.S. at 390).

With that in mind, the district court properly denied Woodburn's request for an evidentiary hearing. Critically, a state court already adjudicated his claims on the merits. *See* 28 U.S.C. § 2254(d). Federal habeas review of such claims falls under § 2254(d) and "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see Shoop*, 596 U.S. at 819. Notably, the record before the state court included Dr. Healy's report and other evidence supporting Woodburn's two ineffective-assistance claims. Neither this Court nor the district court can consider additional evidence in reviewing the reasonableness of the state court's resulting decision. *See Shoop*, 596 U.S. at 819–20; *see also Hodges v. Colson*, 727 F.3d 517, 541 (6th Cir. 2013).

Woodburn disagrees. He directs us to § 2254(e)(2), a neighboring AEDPA provision. That subsection bars (with limited exceptions) evidentiary hearings for habeas petitioners who "failed to develop" the factual basis of their claims in state court. 28 U.S.C. § 2254(e)(2). Then, citing the

Supreme Court's *Williams v. Taylor* decision, Woodburn correctly notes that a habeas petitioner does not "fail" to develop his facts if external forces stymie his diligent efforts to do so. 529 U.S. 420, 436–37 (2000). Thus, Woodburn concludes, an evidentiary hearing is permissible because the state courts unreasonably denied his claims without allowing him to fully develop his facts.

That argument is unpersuasive. Woodburn rightly says that he never "failed to develop" the factual record under § 2254(e)(2). But unlike in *Williams*, Woodburn's efforts to develop his facts were not frustrated by outside forces—or by any forces at all. Rather, Woodburn *succeeded* in developing the record. The state court considered all the facts necessary for deciding Woodburn's Paxil-based claims, including Dr. Healy's expert report. It then adjudicated those claims on the merits. Indeed, Woodburn concedes that he "can satisfy § 2254(d)'s deferential standard of review based on the state record alone." Appellant's Br. 66. Because Woodburn properly developed the factual basis of his claims in state court, § 2254(e)(2) is inapplicable. And, under § 2254(d), we limit our review to the facts before the state court. The district court did not err in denying Woodburn an evidentiary hearing.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's order.